857 F.2d 448
 57 USLW 2188
 Larry Henry CARTER, Courtney Demaris Carter, and Maurice
LaBelle, Appellants,
v.
BROADLAWNS MEDICAL CENTER, Polk County Hospital Trustees;
Douglas Hart; John Ahern; William Dyar; Carole Romine;
Margaret Stout; Jeanne Miller; Milton Brown, Executive
Director; Charles Ingersoll, Hospital Director; Quentin
Hunter, Social Services Director; Lloyd Kaufman, Volunteer
Chaplain; Peter Pintus and Raymond Runkel, Appellees.
 Nos. 87-2393, 87-2425.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 14, 1988.
Decided Sept. 13, 1988.
Rehearing and Rehearing En Banc Denied Nov. 2, 1988.
 
 James Sayre, Des Moines, Iowa, for appellees.
 Scott Hartsook, Des Moines, Iowa, for appellants.
 Before HEANEY and JOHN R. GIBSON, Circuit Judges, and HARPER,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 This case arises under the religion clauses of the first amendment and requires us to determine whether, on the record before us, a county hospital may hire a chaplain paid with taxpayers' moneys. Larry Henry Carter, his minor daughter, Courtney Demaris Carter, and Maurice LaBelle filed this civil rights suit against Broadlawns Medical Center, a county hospital, several individuals associated with Broadlawns, and Iowa Interfaith Agency for Peace and Justice, seeking damages and an injunction prohibiting Broadlawns from hiring a chaplain. The district court[1] held that employing the chaplain would be an unconstitutional establishment of religion, were it not for conditions justifying her employment under the free exercise clause. Accordingly, the court permitted the employment, but imposed restrictions on the chaplain consistent with the parameters of a free exercise rationale for her employment. The court also awarded the taxpayers attorneys' fees under 42 U.S.C. Sec. 1988 (1982). Broadlawns appeals the portion of the order imposing the restrictions and awarding fees. The taxpayers cross-appeal, attacking the district court's decision to permit Broadlawns to employ a chaplain and its refusal to enjoin various practices related to the chaplaincy. The taxpayers also argue the district court should have granted them damages and more attorneys' fees. We affirm the district court's order in part and remand for the district court to modify its order in part and to reconsider the attorneys' fees award in light of our opinion.
 
 
 2
 Broadlawns is a county hospital in Polk County, Iowa, which serves the county's indigent. Broadlawns has a psychiatric ward, which makes up about fifty percent of the inpatient population, and a chemical abuse unit. About a third of the psychiatric patients have been committed involuntarily. Patients in the psychiatric and chemical abuse wards are not free to leave at will, and the less than twenty-five percent of the patients in those wards who are allowed to leave at all must obtain passes. The hospital also confines prisoners of law enforcement agencies who are sent there for treatment.
 
 
 3
 In the past Broadlawns depended on a volunteer chaplain program under which volunteers would counsel patients and perform other chaplaincy services with no remuneration from Broadlawns. Though there was evidence that Broadlawns sought diligently to obtain sufficient numbers of volunteer chaplains to serve its patients, the program proved inadequate to meet the patients' needs, because of lack of manpower and lack of experience on the part of the volunteers, expecially in dealing with the large population of psychiatric patients.
 
 
 4
 In 1984 the Broadlawns Board of Directors voted to employ a full time chaplain. Iowa Interfaith Agency for Peace and Justice agreed to screen the applicants. Larry Henry Carter, Courtney Demaris Carter and John Doe (later identified as Maurice LaBelle) sued as taxpayers under 42 U.S.C. Sec. 1983 (1982) and 42 U.S.C. Sec. 1985 (1982) to enjoin Broadlawns from hiring a chaplain and for damages. The district court denied the taxpayers' motion for a temporary restraining order, Carter v. Broadlawns Medical Center, No. 84-800-E (S.D.Iowa Sept. 9, 1985), and Broadlawns hired its present chaplain, Maggie Alzeno Rogers.
 
 
 5
 At the trial for the permanent injunction and damages, there was evidence that Rogers has a Masters of Divinity degree and is trained in grief counseling and Clinical Pastoral Education, or C.P.E. She is not an ordained minister, but is a deacon of the United Church of Christ.[2] The precepts of C.P.E. are central to Rogers' practices at Broadlawns. Under the principles of C.P.E., a chaplain makes himself available for counseling, but allows the patient to direct the conversations and avoids initiating or guiding religious discussion. Rogers testified:
 
 
 6
 The philosophy is * * * we do not force your faith understanding on anyone. We do not proselytize, that is a violation of a person who is already in a fairly helpless condition, crisis situation, everything else is already up in the air. So you're very careful not to violate that person's human rights.
 
 
 7
 You listen very carefully to their story, to their faith language, to the symbols that are important to them, and you help them find the resources of faith and the resources of their life whether that be family or their church or their faith or their own history, how have I gotten through hard situations before, and help them to find their own strengthening and own courage. To do anything else than that, according to the philosophy of CPE, is unconscionable.
 
 
 8
 Tr. 101. She testified that she was trained to counsel atheists as well as theists of all persuasions, since CPE teaches its adherents "to facilitate just human expression whether that person be atheist or something else." Tr. 119.
 
 
 9
 Rogers' duties include calling on patients prior to surgery (whether or not the patient has asked to see her), making herself available for counseling in intensive care and surgery waiting rooms, and making rounds on the psychiatric and medical wards to see patients who have either expressed an interest in seeing her or have been referred to her by hospital staff or volunteer chaplains. She also conducts Christian worship services and a Bible study class in the hospital for those who wish to attend and has conducted religious funerals and administers the sacrament of holy communion when asked to do so. Rogers has developed a job description for her position, which states in part that her job is: "[T]o provide consistent pastoral care throughout the Medical Center, adding spiritual support and counseling to the ongoing healing effort." Carter v. Broadlawns Medical Center, 667 F.Supp. 1269, 1272 (S.D.Iowa July 9, 1987).
 
 
 10
 Medical witnesses testified to the usefulness of Rogers' style of chaplaincy from a medical point of view. Dr. Berry Engebretsen, Broadlawns' Medical Director for the Primary Care Unit, testified that the hospital should use a "wholistic" approach to medicine, and that this means that the patient's "spiritual" as well as bodily, social and emotional states affect his health, "you need to have tools and methodologies to diagnose and treat the entire picture of human health." Tr. 615. Engebretsen testified that by using the word "spiritual," he did not mean to imply adherence to "a particular denomination or world religion." Tr. 615.
 
 
 11
 The Broadlawns Director of Psychiatry, Dr. Timothy Olson, testified that psychiatric patients often need the support provided by a chaplain and stressed those patients' inability to leave the hospital at will and the isolation from ordinary sources of support frequently caused by their mental illness itself. He testified that it was necessary to have an experienced chaplain who was able to work with the doctors in caring for Broadlawns' psychiatric patients, particularly those with religious delusions. The volunteer chaplain program had been unsatisfactory because the volunteer chaplains did not have the special experience necessary for working with these patients. Olson testified:
 
 
 12
 [Our patients] are suggestible and vulnerable, as I've mentioned, and in many ways they are quite different than the clients that most chaplains work with. I think that it requires someone with a fair amount of experience in working with these patients, and I think it's important that someone coordinate the volunteer chaplains so that they understand some of the special features of our patients.
 
 
 13
 Tr. 237.
 
 
 14
 Rogers herself testified about ways that she is able to help the physicians communicate with patients and their families in difficult situations: "I am a liaison between [the patients' families] and the rest of the medical team." Tr. 48. "Medical doctors and psychiatrists sometimes call me for consults * * *." Tr. 56. For example, doctors might ask her to talk to a dying patient about whether he wanted to be in "do not resuscitate" status. Tr. 56. "Psychiatrists also call me for consults. If a patient comes into [the psychiatric ward] with some religious ideations of one kind or another, would you go and see so and so and get back to me and let me know what you think * * *." Tr. 57.
 
 
 15
 Rogers' testimony brought out the fact that in situations of grave illness, insanity and death, religious problems exist and must be dealt with no matter how secular the hospital. Rogers is able to serve as a moderator between persons experiencing the most profound religious problems and the public employees who must care for those persons.
 
 
 16
 On the basis of these facts, the district court held that the chaplaincy generally was constitutional, but imposed some restrictions on the chaplain's activities. 667 F.Supp. at 1283. The court first considered whether the chaplaincy constituted a state establishment of religion. It determined that there was no evidence of long-standing historical practices like those underlying the legislative chaplaincy upheld in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). 677 F.Supp. at 1279.
 
 
 17
 Therefore, the court applied the three part establishment test of Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111 (1971), which inquires "whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." Lynch v. Donnelly, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). The district court "recognize[d] that Chaplain Rogers fulfills some secular duties at the hospital, including grief counseling and other secular patient counseling. * * * The principles of CPE appear to indicate that a person's 'spiritual needs' do not necessarily mean 'religious needs.' " 667 F.Supp. at 1279. However, because "[o]ne of [the chaplaincy's] main purposes [was] to meet the religious needs of patients," Id., the court held the chaplaincy failed the Lemon "secular purpose" test. Next, the court applied the Lemon "secular effect" test and held that the effect of the chaplaincy was to promote religion: "Paying a chaplain to provide religious care (while not the chaplain's only duty), is an advancement of religion." 667 F.Supp. at 1279. The court concluded the chaplaincy entailed no undue entanglement between church and state, but since the court had already found problems in the purpose and effect inquiries, it held the chaplaincy could not pass the Lemon test. 667 F.Supp. at 1280.
 
 
 18
 The court then determined that because the patients at Broadlawns had little ability to leave in search of spiritual counseling, whether because of their health, their indigency or psychiatric ward restrictions, hiring a chaplain to come to them was a constitutional accommodation of the patients' free exercise rights. Id. at 1280-81.
 
 
 19
 Therefore the court determined that the chaplaincy was permissible, but imposed some restrictions on Rogers' activities consistent with the free exercise rationale. It held Rogers could not counsel those whose mobility was not restricted--that is, patients' families not engaged in a death-bed vigil, employees and outpatients. Id. at 1282. By later order, the court modified the July 7 order to permit Rogers to counsel oncology outpatients and their families. Carter v. Broadlawns Medical Center, 672 F.Supp. 1149, 1150 (Sept. 29, 1987).
 
 
 20
 The court also concluded that Broadlawns' policy of allowing chaplains open access to medical records invaded the patients' privacy rights, and the court ordered the hospital to require express permission from the patient or his guardian before granting chaplains such access. 667 F.Supp. at 1282. The court refused to award damages, id. at 1283, or to enjoin Broadlawns from reserving parking spaces for chaplains, letting the chaplains wear "chaplain" name tags, storing religious artifacts in a conference room for use at worship services, or providing a space on admission forms where patients may (but do not have to) indicate their religious preferences. Id. at 1281.
 
 
 21
 In a later order the court held that since the taxpayers succeeded in restricting the chaplain's activities, they were prevailing parties and entitled to attorneys' fees of $18,871.20 and expenses of $902.45. 672 F.Supp. at 1151.
 
 
 22
 On appeal Broadlawns urges us to modify the court's order by lifting the restrictions placed on Chaplain Rogers' practices and eliminating the attorneys' fees award. The taxpayers cross appeal, arguing that the court erred in permitting employment of a chaplain even with the restrictions, in denying their several claims for related injunctive relief, and in not awarding damages or sufficient attorney fees. We shall consider first the general question of whether Broadlawns may hire a chaplain; next, the propriety of the restrictions the district court imposed; and finally, the arguments that the district court did not grant enough relief.
 
 I.
 
 23
 Broadlawns defends the constitutionality of hiring a chaplain under two discrete establishment clause analyses: the historical analysis employed in Marsh v. Chambers and the three part test of Lemon v. Kurtzman. Broadlawns' historical evidence consisted of testimony that Broadlawns had a long-standing volunteer chaplain program, that state mental hospitals have paid their chaplains since about 1950, and that the state has paid chaplains for its prisons since the nineteenth century. June 26, 1986 Tr. 29-30. In Marsh v. Chambers evidence of the contemporaneous actions of those who drafted the first amendment was held to reveal that the legislative intent behind the first amendment is not violated by legislatures maintaining chaplains. 463 U.S. at 786-92, 103 S.Ct. at 3333-36. We do not believe the evidence recounted in Marsh can support a rule permitting state sponsored chaplaincies of any stripe. Nor is Broadlawns' evidence of relatively long-standing practices in Iowa sufficient to win the day under Marsh, since Marsh made it clear that the mere fact that a practice has been carried on for a long time is not determinative, 463 U.S. at 790, 103 S.Ct. at 3335, and the trial evidence of Iowa state practices sheds no light on the legislative intent of the first amendment's framers, as the evidence did in Marsh.[3]
 
 
 24
 Under the three part Lemon test, the district court's findings of historical fact are reviewed under the clearly erroneous standard. However, it appears from a close reading of the methodology used by the majority in Lynch v. Donnelly that the ultimate conclusion of whether a practice passes each part of the test is a mixed question of fact and law. See Lynch, 465 U.S. at 678-85, 104 S.Ct. at 1361-66; see also Lynch, 465 U.S. 691, 693-94, 104 S.Ct. 1368-69, 1369-70 (O'Connor, J., concurring) ("[W]hether a government activity communicates endorsement of religion is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is * * * in large part a legal question * * * "); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 2500-01, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring). Cf. Lynch, 465 U.S. at 680-81, 104 S.Ct. at 1362-63 (Burger, C.J.) (using language of the clearly erroneous test) and id. at 704 n. 11, 104 S.Ct. at 1364 n. 11 (Brennan, J., dissenting). In this case the findings of simple historical fact are, for the most part, uncontroverted.[4] The arguments focus on the reasoning by which the district court moved from the historical facts to the ultimate conclusions under the Lemon test; thus, the issues are limited to questions of law.
 
 
 25
 The first question posed by the Lemon test is "whether the challenged law or practice has a secular purpose." Lynch, 465 U.S. at 679, 104 S.Ct. at 1362. Lynch made it clear that the presence of religious purposes would not doom a law or practice, as long as there was also a secular purpose. "The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations. Even where the benefits to religion were substantial * * * we saw a secular purpose and no conflict with the Establishment Clause." Id. at 680, 104 S.Ct. at 1362 (citations omitted). Accord, Wallace v. Jaffree, 105 S.Ct. at 2490.
 
 
 26
 Though the district court correctly observed that the challenged action need not be exclusively secular to pass the purpose test, 667 F.Supp. at 1279, in actuality it considered the presence of a religious purpose fatal, despite factual findings establishing a valid secular purpose. The court recognized Rogers fulfilled some strictly secular duties, "including grief counseling and other patient counseling. * * * The principles of CPE appear to indicate that a person's 'spiritual needs' do not necessarily mean 'religious needs.' " Id. The court also recognized that in the context of Broadlawns, even Rogers' religious duties had a secular purpose: "BMC's intent in hiring Maggie Rogers was to enhance the hospital's 'wholistic' treatment approach." Id. at 1274; accord, id. at 1275. In other words, the purpose of the chaplaincy was the same as that of the hospital generally--to help patients get well or at least to provide the best care possible for those who would not get well. But from these factual findings, the court drew the legal conclusion that the chaplaincy failed the purpose test: "However, * * * the Court concludes that the chaplain's position is not clearly secular. One of its main purposes is to meet the religious needs of patients." Id. at 1279 (emphasis added).
 
 
 27
 The district court in this case slipped into the same legal error made by the district court in Lynch v. Donnelly, by focusing on the religious purpose in isolation from the larger context, which reveals a valid secular purpose: "Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause.... The District Court plainly erred by focusing almost exclusively on the creche." 465 U.S. at 680, 104 S.Ct. at 1363. The Lynch court held that, when seen in the proper context, the religious symbols in the creche were simply part of the celebration of the secular Christmas holidays. Id. at 680-81, 104 S.Ct. at 1362-63.
 
 
 28
 The Second Circuit used reasoning similar to that of Lynch in Katcoff v. Marsh, 755 F.2d 223 (2d Cir.1985), in which taxpayers challenged the Army's chaplaincy program on Establishment Clause grounds. The court remarked that if viewed in isolation the religious aspects of the chaplaincy would fail the Lemon test:
 
 
 29
 If the current Army chaplaincy were viewed in isolation, there could be little doubt that it would fail to meet the Lemon v. Kurtzman conditions. Although the ultimate objective of the chaplaincy may be secular in the sense that it seeks to maintain the efficiency of the Army by improving the morale of our military personnel, its immediate purpose is to promote religion by making it available, albeit on a voluntary basis, to our armed forces.
 
 
 30
 755 F.2d at 232. The Katcoff court rejected the Lemon test, reasoning that it does not take into account the necesary deference to Congress' war power and the military personnel's free exercise rights. Id. at 235. The court affirmed partial summary judgment for the defendants on the grounds that the government's demands on soldiers who were far from home burdened their free exercise rights and that there were important military reasons for providing chaplains to the personnel: "[T]he morale of our soldiers, their willingness to serve, and the efficiency of the Army as an instrument for our national defense rests in substantial part on the military chaplaincy, which is vital to the Army's functioning." 755 F.2d at 237. See also id. at 228 (explaining at length military purposes of chaplaincy). But as to those personnel whose stations did not isolate them from other opportunities to practice their religions, the court remanded for trial, to develop the issue of whether chaplaincy services to these personnel were "relevant to and reasonably necessary for the conduct of our national defense by the Army." 755 F.2d at 238.
 
 
 31
 Although the Second Circuit considered itself to be using a different test, the analysis was the same used in Lynch--determining whether a practice with a religious purpose, when seen in context, also has a secular purpose. See also Stein v. Plainwell Community Schools, 822 F.2d 1406, 1409 (6th Cir.1987) (prayers at graduation exercises can serve secular purpose of "solemnizing" occasion); Van Zandt v. Thompson, 839 F.2d 1215, 1221 (7th Cir.1988) (prayer room in State Capitol has secular purpose of promoting meditation: "The Resolution [authorizing the prayer room] suggests that [the legislators] may legislate better for having taken some time to think quietly").
 
 
 32
 Accepting the district court's findings of historical fact, we conclude that the finding that Broadlawns hired Rogers to enhance its wholistic treatment approach to patient care establishes a valid secular purpose under the Lemon test.
 
 
 33
 The second question posed by the Lemon test is whether the challenged practice has the principal or primary effect of advancing or inhibiting religion. Once again, the district court's findings of historical fact on this issue belie its ultimate conclusion that the effect of the Broadlawns' chaplaincy was to advance religion. The district court's findings stress the fact that the existence and nature of the religious content in Rogers' services to a patient depended entirely on the patient's pre-existing preferences:
 
 
 34
 The record is clear that Chaplain Rogers does perform her duties consistent with the concept of Clinical Pastoral Education (CPE). The explanation of this concept demonstrates that in this setting, the chaplain's function is not the traditional parish-or institutional-style ministry. Rather, its purpose is to address the needs of the individual patient, as defined by the patient, not the chaplain. Proselytization or any effort to impact [sic] religion or religious beliefs upon individuals who do not already have such beliefs is totally inconsistent with the CPE concept and is scrupulously avoided by Chaplain Rogers.
 
 
 35
 667 F.Supp. at 1274. The district court also found that Rogers "does not view her primary focus as religious." Id. at 1281. The evidence supported these findings of neutrality. Rogers' testimony established that patients of all persuasions may take advantage of her counseling on their own terms, and there was testimony by one chaplain from another hospital (who was also trained in C.P.E.) about a recent instance in which an atheist patient had come to him for grief counseling. June 26, 1987 Tr. 37.
 
 
 36
 The taxpayers argue that the chaplaincy violates the effect test by inculcating particular beliefs, by subsidizing religious activities, and by effecting a "symbolic link" between church and state.
 
 
 37
 The district court's findings that Rogers has avoided proselytization show that there is no direct advancement of religion by Broadlawns inculcating any religious belief or practice.
 
 
 38
 The district court based its conclusion that the chaplaincy violated the effect test on the fact that the state was providing financial aid to enable persons in its care to practice their religions: "Paying a chaplain to provide religious care (while not the chaplain's only duty), is an advancement of religion." Id. at 1279. However, some financial benefit to religion has been tolerated in cases applying the Lemon effect test. See Lynch, 465 U.S. at 681-82, 104 S.Ct. at 1363-64. The district court's findings of neutrality distinguish this case from cases such as Grand Rapids School District v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 3228-29, 87 L.Ed.2d 267 (1985), where state subsidies would go to sectarian institutions, and also from cases in which state law favored religious citizens over nonreligious ones. E.g., Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 105 S.Ct. 2914, 2918 fn. 9, 86 L.Ed.2d 557 (1985) (law requiring employees to give sabbatarian employees their sabbath day off work favored religious employees over others with nonreligious reasons for wanting a particular day off). Instead, the money is spent to employ a counselor who has the versatility and training to help persons all along the continuum of religious dispositions, from those who only desire nonreligious counseling to those who desire religious discussion and ritual.
 
 
 39
 The taxpayers also argue that Broadlawns has violated the "effect" element of Lemon by creating a symbolic tie between church and state. Again, the findings of neutrality of the chaplaincy as practiced by Chaplain Rogers distinguish this case from those cited by the taxpayers. In Ball the state programs were declared unconstitutional in part because they tended to give the school children the impression that the state supported their particular denomination. 105 S.Ct. 3226-27.[5] In Voswinkel v. City of Charlotte, 495 F.Supp. 588 (W.D.N.C.1980), a city entered an agreement with a particular congregation for the congregation to select a police chaplain whose salary would be paid partly by the congregation and partly by the city. Though the evidence established that the chaplain believed it was his duty to abstain from proselytizing, 495 F.Supp. at 592, the symbiotic relationship created between the city and a particular congregation is enough to distinguish this case from the holding of Voswinkel. See 495 F.Supp. at 596. Cf. Stein, 822 F.2d at 1410 (Milburn, J., concurring) ("If a prayer is nonsectarian and nondenominational, it does not cross that boundary of putting the state's imprint on religion.").
 
 
 40
 The taxpayers also argue that the chaplaincy violates the effect test because it is politically divisive. Without evaluating whether the record reflects divisiveness, we simply observe that the Supreme Court has confined "the question of 'political divisiveness' * * * to cases where direct financial subsidies are paid to parochial schools or to teachers in parochial schools.' " Bowen v. Kendrick, --- U.S. ----, 108 S.Ct. 2562, 2578 fn. 14, 101 L.Ed.2d 520 (1988) (quoting Mueller v. Allen, 463 U.S. 388, 404 n. 11, 103 S.Ct. 3062, 3071, n. 11, 77 L.Ed.2d 721 (1983)).
 
 
 41
 In sum, we cannot conclude that the facts as found by the district court show an impermissible advancement of a particular religion, or of religion over non-religion.
 
 
 42
 The final question of the Lemon test is whether the challenged practice gives rise to undue entanglement between church and state. The district court held it did not. We agree with that holding, in light of the evidence that Chaplain Rogers' presence has in fact reduced the need for oversight of the volunteer chaplains by other hospital personnel, because it is part of Rogers' job to supervise the volunteer chaplains to make sure they abide by the non-proselytization principles of C.P.E. Tr. 119, 141, 237. It is obvious that employing a chaplain causes some entanglement, but the testimony in this case showed time and again that the nature of the hospital's services make it necessary for hospital employees to deal with patients' religious problems in making decisions about how to care for the patients. Decisions such as whether to resuscitate a patient or allow him to die have a religious tenor for most patients that the hospital cannot avoid, either by ignoring it or by depending on a volunteer program that the district court found inadequate, 667 F.Supp. at 1271. Cf. Wilder v. Bernstein, 848 F.2d 1338, 1348 (2d Cir.1988) (By undertaking to provide foster care for children, state will inevitably face some entanglement in religion attendant on providing children religious education; therefore, entanglement test involves comparing degrees of entanglement attending various courses of action). The evidence indicates that hiring a person trained to facilitate the patients' resolution of religious dilemmas should lessen, not increase, the hospital's entanglement in them.
 
 
 43
 Though we disagree with the district court's conclusion that the Broadlawns chaplaincy violated the Establishment Clause, we agree with the district court's alternative theory that the chaplaincy is a permissible accommodation of at least some patients' free exercise rights. There was evidence that a large percentage of Broadlawns' patients were subject to restrictions on their movement attributable to the state by virtue of the fact that the patients were prisoners or had been involuntarily committed or by virtue of hospital rules in the psychiatric ward. Such restrictions constitute a state-imposed burden on the patients' religious practices that the state may appropriately adjust for. See Corporation of Presiding Bishop v. Amos, --- U.S. ----, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987); id. 107 S.Ct. at 2874-75 (O'Connor, J., concurring in judgment); Katcoff v. Marsh, 755 F.2d at 234; Baz v. Walters, 782 F.2d 701, 709 (7th Cir.1986).
 
 II.
 
 44
 Most of the restrictions the district court imposed on Rogers' practices resulted from the court's conclusion that the chaplaincy was only permissible insofar as it alleviated the obstacles to religious practice posed by the patients' immobility. Since our holding does not rest on the fact of immobility, but on the secular goal of helping patients to get well, it is appropriate to lift the restrictions prohibiting Rogers from counseling outpatients and patients' families. Allowing the chaplain to counsel outpatients has the same therapeutic value as letting her counsel inpatients. While one could argue that counseling patients' families does not directly serve the therapeutic purpose of the chaplaincy described by the witnesses, the argument would be unrealistically restrictive. To the extent the chaplain counsels families, it is largely to help them cope with the problems resulting from the patients' illnesses and to serve as a liaison between the families and the medical staff. Tr. 47-49. Therefore, allowing her to counsel the families serves the same purpose as counseling the patients.
 
 
 45
 However, Chaplain Rogers' testimony describing her counseling of the hospital employees indicates that this counseling focuses on problems other than the patients' illnesses. Though Rogers discussed at length the services she provides to employees, Tr. 51-54; Aug. 26, 1987 Tr. 21-24, the examples she cited did not appear to fit in with the purpose of providing wholistic medicine to the patients. She made the general observation that providing the staff counseling helped them serve the patients better. Aug. 26, 1987 Tr. 22. This wide-ranging principle, however, is far too loosely related to the secular healing purpose found by the district court to permit Chaplain Rogers to engage in religious counseling of the employees.
 
 
 46
 However, the record established that Chaplain Rogers also provides a significant amount of purely secular counseling to the employees. She testified that her exchanges with staff members primarily involved assisting the employees with personal problems, such as letting off steam about supervisors, dealing with gossip and teen-age children, and venting grief over loss of a family member. Chaplain Rogers viewed her service as giving support and encouragement, and she stated that it was relatively rare for these interactions to assume a religious nature. Tr. 52. If the hospital chooses to use Rogers to provide strictly secular counseling to its employees, it is evident that there is no constitutional barrier to this decision.
 
 
 47
 Accordingly, the district court's order should be modified insofar as it restricts the chaplain from engaging in employee counseling that is non-religious in nature, and we remand to the district court to fashion an appropriate order.
 
 
 48
 The restriction requiring the chaplain to have express permission to review medical records is consistent with and even mandated by the non-coercion reasoning we have used today. Central to our decision in this case is the idea that the nature and extent of Rogers' services to a patient are entirely dependent on the patient's wishes. Permitting a chaplain to review the patient's records without the patient's (or his guardian's) permission would undermine the findings of neutrality we have so heavily relied on.
 
 III.
 
 49
 The taxpayers' additional claims for substantive relief were all properly denied.
 
 
 50
 Permitting chaplains to wear name tags and to call on patients to ask whether the patient desires a chaplain's services; providing parking spaces for clergy, blanks on admissions forms for indicating religious preference on an optional basis, and optional religious services; and storing religious supplies in the hospital for use at the optional services are all practices that are reasonably necessary accoutrements of the chaplaincy and that are covered by our analysis of the chaplain question.
 
 
 51
 The district court's decision that it was not necessary to reach the taxpayer's claim under 42 U.S.C. Sec. 1985 was proper, since the taxpayers alleged the same injury under section 1983 and section 1985 and the court gave them all the relief to which they would have been entitled under either statute. Moreover, the district court found there was no conspiracy to support a section 1985 claim. 667 F.Supp. at 1277.
 
 
 52
 In light of the district court's finding that the taxpayers have not had their medical files reviewed by a chaplain, the district court's findings of no damages was quite proper.
 
 
 53
 The factors relevant to setting the attorneys' fee award have been affected by our opinion today, which alters the degree of success the taxpayers achieved, see generally Hensley v. Eckerhart, 461 U.S. 424, 434-37, 103 S.Ct. 1933, 1939-41, 76 L.Ed.2d 40 (1983), and we therefore remand the attorney's fee portion of this case for redetermination in light of the modifications we have ordered.
 
 
 54
 The district court's order granting injunctive relief and denying damages is affirmed, but must be modified to eliminate the restraints prohibiting Broadlawns' paid chaplain from counseling patients' families and outpatients, and from providing non-religious counseling to Broadlawns' employees. The case is remanded to the district court to enter an order consistent with this opinion.
 
 
 
 *
 The HONORABLE ROY W. HARPER, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation
 
 
 [1]
 The Honorable Donald E. O'Brien, Chief Judge, United States District Court for the Northern District of Iowa and Judge, United States District Court for the Southern District of Iowa
 
 
 [2]
 Broadlawns did not require candidates for its chaplaincy to be affiliated with any particular religion
 
 
 [3]
 Our research indicates that the practice of employing chaplains in publicly funded asylums dates back to at least 1866. See Veteran's Administration Manual M6-3 (Chaplain's Manual) 1 (1950). Since our opinion rests on other grounds, we will not ask the parties to address the propriety of taking judicial notice of this information or the significance of this information under Marsh v. Chambers
 
 
 [4]
 The taxpayers do argue that the volunteer chaplain program adequately served Broadlawns' needs, but the district court's findings to the contrary, 667 F.Supp. at 1271, are well supported by the evidence
 
 
 [5]
 Ball is also distinguishable because it involved impressionable school children, see 105 S.Ct. at 3226, and the Supreme Court has been "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." Edwards v. Aguillard, --- U.S. ----, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987)