Stephanie BRUKER, Plaintiff,

v.

CITY OF NEW YORK; New York City Department of Social Services/Human Resources Administration/Child Welfare Administration, currently operating as Administration of Children's Services; Robert Little, in his individual capacity and in his official capacity as Commissioner of the New York City Child Welfare Administration; Dolores Perry, in her individual capacity and in her official capacity as a caseworker for the New York City Child Welfare Administration; and Father Flannagan's Boystown, New York, Defendants.

No. 93 Civ. 3848 MGC.

United States District Court, S.D. New York.

Sept. 29, 2004.

Barry, McTiernan & Moore, by Suzanne M. Halbardier, New York City, for Municipal Defendants.

Morris, Duffy, Alonso & Faley, LLP, by Yolanda L. Himmelberger, New York City, for Defendant Father Flannagan's Boystown.

Stephanie Bruker, Hastings, NY, Plaintiff pro se.

## OPINION

CEDARBAUM, District Judge.

Defendants the City of New York, the City of New York Department of Social Services, Human Resources Administration ("HRA"), Child Welfare Administration ("CWA"),[1] Robert Little, sued in his official capacity as Commissioner of the CWA and in his personal capacity,[2] Dolores Perry, sued in her official capacity as a CWA caseworker and in her personal capacity (collectively, "the municipal defendants"), and Father Flanagan's Boystown ("Boystown") move for summary judgment on plaintiff Stephanie Bruker's second

---

1. The Child Welfare Administration is now called the Administration for Children's Services. Since the second amended complaint uses the former title, that title is used throughout this opinion.

2. Commissioner Little died in 1999. Fed. R.Civ.P. 25(d)(1) provides that the death of a public official sued in his official capacity causes the automatic substitution of his successor as a party. This opinion will continue to refer to defendant Little with respect to the official capacity suit because all parties have continued to do so.

amended complaint. Bruker moves for partial summary judgment and for several other forms of relief. The complaint alleges that defendants violated Bruker's free exercise right under the First Amendment when they placed her daughter Elianne in foster care with deliberate disregard for the fact that mother and daughter were Jewish. The complaint also alleges other violations of federal and state law. Bruker has raised issues of fact with respect to whether defendants Perry and Boystown made reasonable efforts to accommodate Elianne's religious upbringing. However, Bruker has failed to show that the remaining defendants can be held liable for the actions of these defendants, or that any defendant is responsible for the other alleged violations of Bruker's rights. Accordingly, Bruker's motion for summary judgment is denied, and defendants' motions are granted in part and denied in part, for the reasons which follow.

## BACKGROUND

### I. *Procedural History*

Bruker commenced this action on June 8, 1993. She filed the original complaint in her own behalf and in behalf of her minor children, Elizabeth–Ann Marcovitz ("Elianne"), born June 5, 1978, and Allison Natalie Marcovitz ("Allison"), born November 11, 1976. The complaint named the municipal defendants as well as the Catholic Home Bureau ("CHB"), a private foster care agency. The case was placed on the suspense docket at plaintiff's request on January 20, 1994. On June 5, 1998, the case was restored to active status. Bruker filed an amended complaint on June 1, 1999. Because her daughters had become adults, the amended complaint asserted only Bruker's claims. Bruker

added several defendants: Mayor Rudolph Giuliani; Deputy Mayor John Dyson; Marva Livingston Hammons, Commissioner of the HRA; Katherine Kroft, Executive Deputy Commissioner of the HRA; and Boystown.

All of the defendants except Boystown moved to dismiss the amended complaint. That motion was granted in part and denied in part in an opinion dated March 31, 2000. *See Bruker v. City of New York*, 92 F.Supp.2d 257 (S.D.N.Y.2000). The complaint was dismissed against Giuliani, Dyson, Hammons, Kroft, and the CHB, and dismissed in part against the remaining defendants.

After discovery, Bruker sought leave to file a second amended complaint in order to add a substantive due process claim and claims of tortious interference with custody, fraudulent concealment, and the "tort of outrage." Magistrate Judge Pitman, to whom the case had been referred, denied plaintiff leave to add these claims in an opinion and order dated January 31, 2003. *See Bruker v. City of New York*, 93 Civ. 3848, 2003 WL 256801 (S.D.N.Y. Feb. 4, 2003). However, he permitted her to amend the complaint to add facts learned in discovery and to replead the outrage claim (which he construed as a claim of intentional infliction of emotional distress) with greater particularity.

Bruker filed a second amended complaint on February 10, 2003. Defendants move for summary judgment on the following counts:[3]

Counts Three and Four allege that defendants willfully placed Elianne in a non-Jewish home, failed to supervise Elianne's religious practices there, and failed to transfer her to a Jewish home. While

---

**3.** Count One is a substantive due process claim which was dismissed on March 31, 2000. *See Bruker*, 92 F.Supp.2d at 267–68. Count Two is the substantive due process

claim which Judge Pitman denied plaintiff leave to plead. Bruker's motion to amend the complaint to include these claims is discussed at the end of this opinion.

Bruker articulates these as separate claims of violation of her free exercise and substantive due process rights under the Constitution, they are based on the same actions and will be analyzed as a single free exercise claim.

Count Five alleges that defendants violated Bruker's substantive due process right to family privacy and confidentiality by publicizing the neglect petition filed against her to the media and to Elianne's attorney.

Count Six alleges that the municipal defendants violated Bruker's procedural due process right by failing to give her a hearing before removing Elianne from her custody. This claim survived defendants' motion to dismiss, but was limited to a claim of injury to plaintiff's liberty interest occurring in the period between Elianne's removal and the post-deprivation hearing which plaintiff received. *Bruker*, 92 F.Supp.2d at 267.

Bruker also contends that defendants are liable for intentional infliction of emotional distress, negligence, gross negligence, negligent supervision, negligent training, and negligent hiring.

## II. *Facts*

Following are the facts which defendants offer in support of their motions for summary judgment. Evidence offered by Bruker, and Bruker's objections to defendants' evidence, are included where relevant.

Sometime before March of 1992, Bruker and her two adopted daughters, Allison and Elianne Marcovitz, moved from their native Canada to the Bronx. Between March and May of 1992, three Reports of Suspected Child Abuse or Maltreatment were filed with the New York Central Register of Child Abuse and Maltreatment.[4] A CWA caseworker, defendant Perry, was assigned to investigate. In the course of the investigation, Perry spoke with Elianne, but never with Allison. She attempted to speak with Bruker, but Bruker said that she would speak with the CWA after she returned from a trip with Allison to Canada. Perry's notes indicate that CWA caseworkers spoke with the girls' psychiatrists, a friend of the family, and the sources of the reports.

At the end of April, Bruker agreed to voluntarily place Allison, in foster care. She stipulated, in the Voluntary Placement Agreement she signed, that Allison was to be placed in a foster home only through Jewish Child Care ("JCC"), a Jewish foster care agency.[5]

After the third report was filed, Perry met with Elianne and observed scratches and slight bruises on her. Elianne told Perry she was trying to work things out with her mother and that she did not feel that she was in danger. On May 26, Allison was hospitalized after attempting suicide. That same day, Perry sought legal assistance in order to file a neglect petition.

On June 5, 1992, the CWA filed two petitions in the Family Court. The petitions recounted the three abuse reports and Allison's attempted suicide, and sought

---

**4.** Bruker disputes the veracity of these reports, but does not dispute that the reports were actually filed.

**5.** Bruker moves to strike the Voluntary Placement Agreement from defendants' exhibits, claiming that it has been falsified. Specifically, Bruker alleges that she agreed to a limited placement of Allison in foster care, but that the form submitted by defendants indicates an "indefinite placement." The relevance of the alteration—if it is an alteration—to the issues in dispute is not apparent. The agreement itself is important evidence that the CWA and Perry knew that plaintiff sought a Jewish home for her children. Accordingly, plaintiff's motion to strike is denied.

the protection of the court for the children. Judge Cira Martinez signed an order placing the children in the custody of the CWA. However, neither child was removed from Bruker's custody at that time.

Elianne and Bruker appeared in court on June 9, 1992. Elianne stated, through her law guardian, that she did not wish to return home with her mother. Her law guardian proposed that she enter foster care. Bruker's attorney responded as follows:

> I see no reason for [Elianne] not to return home, although as she is of age to make her own determination, at this point ... I understand that she will make that determination, although I would request a 1028 hearing, and if necessary, we will go forward with that.... I would also let the court know that the child, Elliane [sic], is under psychiatric care. She's in the middle of her exams in school, and that any placement must take that into consideration, that I expect all her examinations shall be taken on time, that she will go to the same school if possible, so that she can finish her semester, and also that she continues under psychiatric care that she's now getting.

After further discussion among the parties, the court remanded both children to the custody of the CWA and ordered that Elianne continue attending her school in the Bronx for the balance of the semester. Specifically, the judge stated: "Remand to C.S.S. ... of Elliane [sic] as well as Allison, pending any other appropriate notifications of voluntary placement. The child Elliane [sic] is ordered to attend Junior High School 141 until completion of the school year."

It is unclear whether defendants sought a Jewish home for Elianne on the day she left her mother's custody. Elianne testified during her deposition that Perry asked her whether she wanted to be placed in a Jewish home and informed her that the CWA was having a difficult time finding one. Elianne told Perry it was not important. But Perry testified in a Family Court hearing that she understood that she was to find Elianne a home in the Bronx so that Elianne could continue to attend her school, and did not learn until the next day that Bruker required a Jewish home for Elianne. This testimony is flatly inconsistent with Perry's deposition testimony, in which she states that she became aware that Bruker required a Jewish foster home for Elianne because Bruker said so in court on June 9.[6] Finally, there is no question that Perry, as the family's caseworker, was aware of Allison's voluntary placement, which the parties agreed was to occur only through a Jewish agency.

It is undisputed that on the evening of June 9, the CWA placed Elianne in the home of Susan Savoca via the CHB. Savoca is Catholic. The parties do not dispute that Savoca was informed that Elianne was Jewish and was informed that one of her obligations as a foster mother was to protect the religion of the child placed in her care. Elianne testified at her deposition that Savoca never went to church, only spoke about Catholicism with Elianne in response to the girl's questions, and never told Elianne how important her religion

---

**6.** Bruker moves to strike the deposition testimony of Perry, Elianne, and another witness, Carolyn Novicoff, based on the fact that defendants did not submit all of the exhibits used at the depositions of these witnesses. Even if this were a cognizable basis upon which to strike exhibits offered in connection with a summary judgment motion, the purpose of plaintiff's motion is not clear, as Bruker herself has submitted copies of the same deposition testimony with the exhibits attached. Accordingly, her motion to strike is denied.

was to her. Bruker offers evidence which shows that Susan Savoca requested a Catholic child when she became certified as a foster parent. Savoca stated that she could consider other religions, but would be most comfortable protecting the faith of a Catholic child. Bruker also disputes Elianne's credibility, noting at least one instance in which Elianne admitted to lying in the Family Court proceedings.

On June 11, 1992 the Family Court commenced a hearing pursuant to N.Y. Family Court Act § 1028 to determine whether Elianne and Allison should be returned to Bruker's custody pending the outcome of the neglect proceeding. On June 17, the court determined that returning the girls to Bruker's custody did not pose an imminent risk to their safety or health and ordered that the girls be returned. The CWA appealed this ruling, and the Appellate Division stayed the Family Court's order pending the appeal. Bruker and the CWA subsequently agreed that the CWA would withdraw the appeal and return Allison to Bruker's custody, provided that Bruker consented to Elianne's continued remand.

The CWA has a policy of requiring all of the foster care agencies with which it contracts to provide for the religious needs of the children referred to them, regardless of the religious affiliation of the agency itself. On June 26, after Elianne completed her final examinations, Perry sent a written request to the CWA's Allocations Division, seeking a kosher Jewish home for Elianne. On July 2, David Goldstein, one of Perry's supervisors, directed Perry and others to monitor the CWA's progress in locating a kosher home for Elianne and to report that progress to him on a weekly basis.

Defendants provide evidence that OHEL, a Jewish foster care agency, received a referral, but needed proof that Elianne was Jewish. An interview with OHEL was scheduled for August 5. Bruker contends that she, not the CWA, first contacted OHEL to get the agency involved. A memorandum from Goldstein in Elianne's CWA case file indicates that plaintiff was involved in soliciting OHEL's participation in the case.

Defendants also note that an appointment was made for Elianne with the Bronx House in late June. Plaintiff produces a letter from the Executive Director of the Bronx House, who states that it is not and has never been a foster care agency.

In late July, Elianne told the CWA that she wanted to stay with Savoca. According to Perry's notes, Elianne informed the caseworker that while she would have been happy with a Jewish home had she been placed in one initially, she was now unwilling to leave Savoca. On August 7, the CWA sought the opinion of Elianne's therapist, Dr. Setterberg, as to whether Elianne should be moved from her foster home and whether moving her to a Jewish home would be harmful. In response, Dr. Setterberg and Elianne's other therapist, Dr. Kadish, noted: "To the extent that [Elianne] views her Jewish identity as positive, a Jewish placement could be constructive." Dr. Setterberg also spoke with a caseworker at OHEL, Esther Feuereisen, and stated that he believed that transfer to an orthodox Jewish home would be harmful to Elianne.

Feuereisen interviewed Elianne on August 12. Among other things, she noted: "In truth, [Elianne] has no interest in Judaism or religion. She, however, acknowledges her Jewishness and claims to attend services at an orthodox synagogue with the encouragement of her Catholic foster family." Feuereisen recommended that Elianne be "given a chance with a Jewish family." Feuereisen's notes indicate that she spoke with Perry and Bruker on August 14. Both confirmed that the parties

were exploring a placement for Elianne with an aunt in Canada and would get in touch if placement with OHEL were still an option. On August 18, Perry advised Judge Martinez that OHEL may have found a suitable home in New Jersey. However, Judge Martinez would not accept a placement outside New York, other than Canada.

On September 2, 1992 Bruker filed an order to show cause in the Family Court, seeking an order directing the CWA to transfer Elianne to a Jewish agency. The motion was granted. The CWA then filed an order to show cause seeking to vacate the order directing Elianne's transfer. The CWA offered an affidavit from Perry in which she stated that Elianne threatened to run away if she was transferred from Savoca's home, and that Elianne and her foster parent were attending synagogue and observing Jewish dietary laws. After a hearing, Judge Martinez ordered that Elianne be transferred to an agency run by persons of the Jewish faith as required by New York law. The judge found that Savoca "unfortunately displayed a woeful lack of knowledge with respect to Jewish dietary laws." *In re Elianne Marcovitz*, N–6300–1/92, at 4 (Sept. 24, 1992). The court also determined that the foster mother's testimony "clearly indicates that she has not received proper follow up guidance from Catholic Home Bureau nor from CWA to support the preservation and protection of the child's religious faith." *Id.* at 10. The court noted that after it became clear, contrary to Perry's claims, that Savoca was not following Jewish dietary practices, the CWA argued that "it is not realistic or practical for this foster mother to keep a Kosher home because 'she is a Christian and she is simply doing her job.'" *Id.* at 9. A follow-up order indicates that the court determined that Perry had intentionally submitted a fraudulent affidavit when she affirmed that Elianne was following Jewish practices. The

court also noted the animosity Perry had displayed toward Bruker. The court ordered that Perry have no direct contact with the child. Addendum Decision and Order, *In re Elianne Marcovitz*, N–6300–1/92 (Sept. 24, 1992).

The CWA appealed the order directing Elianne's transfer. The Appellate Division granted a stay, but affirmed the Family Court's decision on December 22, 1992. *See In the Matter of Elianne M.*, 184 A.D.2d 98, 592 N.Y.S.2d 296 (1st Dep't 1992). When Elianne learned of the decision, she ran away from Savoca's home.

Defendants offer evidence that in early January 1993, a Modern Orthodox family in White Plains, the Gutermans, expressed interest in taking Elianne. Judge Martinez permitted a homefinding. Bruker produces an affidavit from Mark Guterman, who said that he and his wife contacted the CWA after learning about Elianne on television. Two caseworkers visited them and discouraged them from taking Elianne because she was "trouble." The Gutermans decided not to pursue the placement.

Defendants' records demonstrate that as of January 7, JCC had located no family and OHEL had no family in the Bronx. A CWA caseworker spoke with Elianne about a home in Flushing on January 15. Elianne was not sure that she was interested, and did not want a religious family. On January 20, OHEL located the Comet family, and interviewed the Comets on January 21. On January 25 Elianne turned herself in to the CWA and was placed in the Comet home.

Bruker offers evidence which suggests that in exchange for Elianne surrendering herself and living with the Comets, the CWA agreed that Elianne could visit Savoca on weekends and after school.

Shortly after entering the Comet home, Elianne complained that she felt uncomfortable in an orthodox home. OHEL appears to have found another home in Riverdale, but Elianne would not go there because it was too close to Bruker. Elianne ran away from the Comets on March 30 and went to Savoca's home. According to notes in the CWA case file, Cynthia Schaeffel, an OHEL caseworker, informed the CWA that it was difficult to place Elianne with Jewish families because she refused to join in religious activities.

Elianne was temporarily placed with a New Jersey family, the Zechers, on approximately April 1. As of April 6, OHEL had several homes available in Manhattan, but they were all orthodox, and Elianne had indicated that homes run by OHEL were "too religious." Judge Martinez agreed to permit Elianne to continue to stay with the Zechers in New Jersey for the time being. On April 14, OHEL advised the CWA that it only had orthodox foster homes available. On April 23, OHEL sent an urgent request to rabbis and placed an ad in the *Jewish News* seeking a Modern Orthodox foster family for Elianne. As of April 29, JCC had located one home, but once again Elianne refused the placement because of its proximity to Bruker.

On May 6 Elianne was scheduled to be transferred from the Zechers to the Swerdlick family in Far Rockaway. However, Elianne ran away when Perry and an OHEL worker attempted to pick her up at school to take her to the Swerdlicks. She appears to have gone to Savoca.

OHEL eventually received twenty-one responses to its advertisement for a Jewish family, but by June 15, it advised the CWA that it had found no family willing to accept Elianne. On June 15 a group home called Geller House placed Elianne on its waiting list, but according to CWA notes, Bruker did not want Elianne placed there.

Because the court, OHEL, the CWA, and Bruker had growing concerns about Elianne's mental health, she was admitted to Four Winds Hospital for an evaluation on June 17, 1993. Four Winds eventually recommended a residential treatment program as the best environment for Elianne. In July, according to OHEL notes, Bruker asked the hospital to keep Elianne for another month while she sought a therapeutic boarding school. The CWA sought placement for Elianne in group homes while continuing to seek placement under a Jewish agency. The Jewish Board of Family and Children's Services had a group home, called Brightwater, but according to defendants' notes, Bruker rejected the placement. JCC had no placements available. OHEL asked to be relieved from the case in August because it had no appropriate placements. Only one group home, the Edwin Gould Academy, had available space. Elianne was placed there on September 21, 1993.

While at Edwin Gould, Elianne indicated on the home's "Spiritual Life Program" sign-up sheet that she wished to attend Catholic services.

According to CWA notes, in October 1993 Edwin Gould informed the CWA that it could not keep Elianne and recommended placement in a group home or foster home through a Jewish agency. Notes in the CWA case file reveal that the CWA spent several months searching for an appropriate facility for Elianne. The only home which would take Elianne was Boystown. Elianne entered Boystown on August 3, 1994.

Under its contract with the CWA, Boystown must accept all children referred to it unless it has a lack of vacancies or believes that such placement would be detrimental to the child. The contract states that Boystown can give no preferences on the basis of religion and cannot refuse to pro-

vide services to any child because of his or her religious background. Boystown required its staff to ensure that each child in its care was able to observe the religious practices specified by his or her parents.

According to Carolyn Novicoff, who was Eastern Regional Director of Boystown while Elianne was placed there, Elianne was introduced to the local rabbi and encouraged to attend services shortly after she arrived at Boystown. She was also encouraged to observe Jewish holidays. Novicoff, who is Jewish, stated that she spoke with Elianne about Judaism on several occasions and celebrated Jewish holidays with her. She also unsuccessfully sought a Hebrew school for Elianne.

Elianne testified that Novicoff spoke with her constantly regarding Judaism, tried to teach her how to cook a Jewish meal, and encouraged her to pursue Jewish practices. She also testified that she was given opportunities to attend shul and celebrate Jewish holidays, but she chose not to. She testified that no one discouraged her from practicing Judaism or encouraged her to practice Catholicism.

Elianne attended Bishop Loughlin Memorial High School from the tenth through the twelfth grades. According to Novicoff, while Boystown was aware that this was a Catholic school, it believed that religion classes were not compulsory. Elianne took a religion class in 10th grade and a "moral issues" class in 11th grade, and served as a religion assistant for an elective class her senior year, after she had turned eighteen. Elianne also testified that she participated in "Christian service," an afternoon volunteer program in which students fed the homeless.

Bruker offers the Bishop Loughlin Memorial High School 2001–2002 student handbook, along with a letter from the assistant principal of the school, who stated that this handbook is substantially the same as the one in existence in 1994. In its "Statement of Philosophy," the handbook notes, among other things:

> Bishop Loughlin Memorial High School is a Catholic high school drawing its Christian perspective from the Diocese of Brooklyn and the three-hundred year Lasallian tradition of the Brothers of the Christian Schools. This tradition values ... the development of caring relationships grounded in Christian values. This tradition holds central the appreciation of each student's uniqueness and views the teacher as a minister of the Gospel.... Loughlin attempts to awaken in its students a set of values which is markedly Christian and challenges the materialistic values of today's society.

Among the "Goals" of the school are to "[p]rovide religious education which promotes the message of the Gospel, teaches Roman Catholicism and respects other religious traditions." The handbook also notes that the school "strive[s] to maintain and promote [its] Roman Catholic identity."[7] Bruker also provides the 1993–1994 Bishop Loughlin Course Catalogue, which contains the following description of "Religion 10," the class Elianne took her sophomore year:

> This course is for students who want to find God, discover themselves, begin to understand and relate to others, and begin to look inside themselves to find out what they believe. You will have an opportunity to look at the important questions in life and discuss what is important in your life. We will then try to see how Jesus' message deals with

---

7. Bruker also includes in her opposition papers an unattributed quotation which indicates that many classes at the school begin with a short prayer, that "Christ and His Presence are integral to every Loughlin day," and that students are "invited to join regular prayer groups and are prepared for the sacraments of initiation."

these questions. The person of Jesus is our example of what it means to be human and holds the answers to life's questions. We will try to understand who Jesus is for us today and how his life and message are a part of our lives.

The catalogue notes that this is a required course for all sophomore students.

On July 6, 1995, Judge Martinez concluded the factfinding on Elianne's neglect petition with a determination that Elianne was a neglected child. On September 28, the judge determined that Elianne should continue in the custody of the CWA until her eighteenth birthday. Elianne remained at Boystown until that time. Then she moved in with Savoca. Elianne converted to Catholicism some time after she turned eighteen. Bruker failed to perfect her appeal of the neglect finding, and the Appellate Division accordingly dismissed the appeal on February 4, 1997.

## DISCUSSION

### I. *Defendants' Motions for Summary Judgment*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). While a court must view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor,

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be

"no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. *Free Exercise of Religion*

Bruker contends that the municipal defendants violated her free exercise right by placing Elianne in the home of a Catholic who made no effort to protect her religion; failing to supervise Savoca's adherence to Jewish customs; failing to move Elianne to a Jewish home; enabling Elianne to see Savoca whenever she wished in exchange for turning herself in and nominally living in a Jewish home; and placing Elianne in Boystown.

Bruker bases her free exercise claims against Boystown on Boystown's initial acceptance of Elianne; its failure to place Elianne in an environment which fostered a Jewish way of life; Boystown's permitting Elianne unlimited access to Susan Savoca; and Boystown's enrollment of Elianne in Bishop Loughlin Memorial High School.

### 1. *Applicable Legal Principles*

The right to control the religious upbringing of one's children is a well-recognized component of the free exercise right protected by the First Amendment. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). "Although the

right of parents to determine their children's religious upbringing is limited when their children are placed or taken into the custody of the state, parents' wishes with regard to their children's religious training while in state custody are afforded some constitutional protection." *Bruker,* 92 F.Supp.2d at 267; *see also Wilder v. Bernstein,* 848 F.2d 1338, 1346–47 (2d Cir.1988).

*Wilder* involved an appeal by several religiously affiliated foster care agencies of the approval of a settlement in a class action suit brought by African–American Protestant children who claimed that New York's foster care system infringed their free exercise and equal protection rights, and violated the Establishment Clause and the Civil Rights Act. The settlement sought to ensure the placement of children without religious or racial discrimination, and instituted a first-come, first-served policy for placement "with a preference for religious matching honored only to the extent that it does not give a child greater access to a program appropriate for his needs over other children for whom the program is also appropriate but who earlier became candidates for placement." *Id.* at 1344. The appellants argued that this policy would violate the free exercise rights of parents and children by reducing the frequency of in-religion placements. *See id.* at 1345. The Second Circuit approved the settlement. While noting that the new policy would likely have the effect that appellants feared, the Court noted: "So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed." *Id.* at 1347.

Few courts since *Wilder* have dealt with parents' claims that the government had failed to protect the religion of children placed in foster care. In *Pfoltzer v. County of Fairfax,* 775 F.Supp. 874 (E.D.Va. 1991), *aff'd,* 966 F.2d 1443 (4th Cir.1992), a mother filed suit on behalf of herself and her three minor children, claiming that the children were prevented from practicing Roman Catholicism after being removed from their home. Drawing heavily on *Wilder,* the court observed that when a child is placed in foster care, "the state cannot reasonably be expected to duplicate the standard of religious practice in the parents' home or satisfy the parents' every request with respect to the children's religious instruction.... While a state should attempt to accommodate parents' religious preferences in selecting a foster care placement, such effort need only be reasonable." *Id.* at 885. The court granted the defendants' motion for summary judgment, concluding that while the plaintiffs had failed to offer any significant evidence to substantiate their claims, the defendants established that two of the children had actually been placed with Catholic foster parents, and that all foster parents received instruction and a handbook concerning how to accommodate the religious beliefs of their foster children. *See id.* at 886. Two of the children attended church regularly, and one attended Catholic instruction classes and made his First Communion while in foster care. The other child chose not to attend classes. The foster parents of the third child could not take her to church because she had behavioral problems. *See id.* "[W]hile the children might not have attended Catholic Mass or religious instruction classes with the frequency they might have had they been living with their mother, they were not restricted in their religious beliefs and practices." *Id.*

In *Walker v. Johnson,* 891 F.Supp. 1040 (M.D.Pa.1995), the mother of two children placed in foster care complained that the agencies and individuals responsible for the placement had violated her free exer-

cise right because her children were placed in a Protestant home and forced to attend church. On the defendants' motion for summary judgment, the court noted that at the time of placement the mother had claimed to be agnostic, and only later informed the foster care agency that she was Jewish. *See id.* at 1045–46. However, the court assumed that her religious beliefs were sincerely held. *Id.* at 1047. The court found that the foster family had given the children food supplied by their mother for Passover but had not attempted to instill Jewish teachings in them. The children did accompany their foster parents to church. However, the court granted the defendants' motion, holding that "[i]t is appropriate, when the initial placement is made, to give some weight to the child's and/or the parent's religious background and place him or her in a setting consistent with that background, [but] that concern ... may be overridden" by the best interests of the child. *Id.* at 1048. One of the children had serious medical needs which required a family trained in CPR who lived near a hospital. The only family capable of meeting these needs was the family with which the children were placed. The court also noted that a transfer would effect a serious disruption in the lives of the children. *Id.* at 1049.

Because *Wilder* announced only a general rule, and the facts of *Pfoltzer* and *Walker* vary significantly from this case, these cases do not provide a great deal of concrete guidance. They do indicate that the reasonable efforts the state must make to accommodate the child's (and the parent's) religious needs should include placing the child with a family of the same religion when doing so is practicable and in the child's best interest (which would mean that such a family is available and can accommodate any other needs that the child might have) and ensuring that the foster family is instructed regarding the

child's religious needs. In addition, to be *reasonable,* a state's efforts should also include some measure of supervision of the foster family's success in enabling the child's religious practices, particularly if an in-religion placement is not possible.

With these general precepts in mind, each of Bruker's specific complaints with defendants' actions is discussed below.

### 2. *Merits of Bruker's Claims*

#### a. *The Placement of Elianne with Savoca and the CWA's Instruction and Supervision of Savoca*

■ Bruker's first complaint is that the municipal defendants deliberately disregarded her religious beliefs by placing Elianne with Savoca. There is no question that Perry knew or should have known at the time of Elianne's remand that Bruker was Jewish and that Bruker had permitted her older daughter, Allison, to be voluntarily placed only through a Jewish organization. Bruker has raised a genuine issue of fact as to whether Perry made any effort to find a Jewish home for Elianne on June 9, 1992. Defendants contend that the court ordered the CWA to place Elianne near her school in the Bronx. This is inaccurate—the court ordered Elianne to attend the same school, but said nothing about where she should be placed. At any rate, requiring that Elianne remain in the Bronx would not have relieved the CWA of its obligation to attempt to find a Jewish home for her there.

The Family Court's ruling, affirmed by the Appellate Division, supports an inference that the municipal defendants made little or no effort to instruct and supervise Savoca regarding Jewish customs or to ensure that she was being appropriately instructed and supervised by the CHB. Defendants offer no evidence to the contrary.

Instead, defendants appear to argue that Bruker's religious beliefs are not sincerely held. They offer some evidence, based primarily on Elianne's deposition testimony, that Bruker did not have traditional Sabbath dinners on Friday night and that the family did not eat exclusively in kosher restaurants when they dined out. Defendants also note that Bruker enrolled Elianne in a Catholic grade school in Montreal when she was in fifth grade. Bruker offers an affidavit from the principal of that school, who states that the school is not affiliated with a Catholic diocese and exempts students from Catholic practices and ceremonies upon their parents' request. Defendants do not dispute that the Family Court found Bruker to be sincere in her beliefs, and that there was no question at the time of Elianne's placement that Elianne was a practicing Jew. Defendants have offered no basis for concluding that Bruker's religious beliefs are not sincere.

Defendants also contend that Elianne was sufficiently mature to make her own choices regarding what religion she chose to practice. Defendants are correct that courts have held in some cases that mature minors have the right to pursue their "own choice of religion regardless of parental attempts to exercise their Constitutional right to raise their children in their own faith." *Whalen v. Allers*, 302 F.Supp.2d 194, 204 (S.D.N.Y.2003). However, defendants have offered no evidence that Elianne was of sufficient maturity to make that choice. Indeed, defendants' own evidence paints a portrait of an extremely troubled adolescent with complex emotional and psychological problems. Defendants have accordingly failed to show that this issue can be resolved on a motion for summary judgment.

Defendants also argue that Perry had a good-faith belief in the truthfulness of what Savoca and Elianne were telling her, and that belief was sufficient to fulfill the City's obligations under *Wilder*. This is unpersuasive for several reasons. First, defendants do not explain why such a good-faith belief is sufficient in the face of Bruker's evidence that Savoca was a practicing Catholic who had told the agency which certified her that she would be more comfortable protecting the faith of a Catholic child. When the state is not successful in placing a child with a family of the same religion, its duty to make a reasonable effort to ensure that the child's practices are protected must involve closer supervision than where an in-religion placement is made. Such oversight is all the more important when the child is placed with a family which expresses a lack of confidence with respect to its ability to protect the child's religion.

Second, defendants cannot escape the fact that the Family Court found Perry to have submitted false information regarding Elianne's religious practices, which calls into serious question the credibility of Perry's version of events. Finally, Bruker offers evidence that Perry displayed great animosity toward her in the course of the Family Court proceedings. Specifically, Bruker's Family Court attorney, Lauren Abramson, testified at her deposition that Perry was abusive in her language and physically threatened Bruker at one point. The Family Court also noted this animus in the order which removed Perry from direct contact with Elianne.

*Wilder* does not require in-religion placements in all circumstances. But it does require, as a first step, that the state make an attempt to find such a home. If that attempt is unsuccessful, the state must make some effort to instruct and supervise the foster parent. Bruker has offered sufficient evidence that Perry did little or nothing to ensure that Elianne's faith was protected. Accordingly, Bruk-

er's free exercise claim arising from these events cannot be resolved on summary judgment.

b. *The Failure to Move Elianne to a Jewish Home*

█ Bruker next contends that defendants made no meaningful effort to place Elianne in a Jewish home during her time in foster care. Defendants respond with evidence that on June 26, Perry began searching for a Jewish home for Elianne and that her supervisor and the director of her office were aware of the problem and involved in the search. Bruker has raised a genuine issue of fact as to the reasonableness and the thoroughness of these efforts until December 1992, when the Appellate Division affirmed the Family Court's transfer order.

Most of the evidence defendants present of their efforts to find a Jewish home for Elianne during this time period is in the form of Perry's notes and testimony. This evidence is problematic, both because Bruker has raised serious questions about Perry's credibility and because many of the notes supposedly documenting the search for a home for Elianne do not appear to be contemporaneous documents— rather, they appear to be summaries of the events of several weeks or months. Moreover, defendants' evidence suggests that Perry was not taking this obligation particularly seriously. For example, defendants do not explain why, if Perry knew by June 9 or 10 that Bruker wanted Elianne transferred to a Jewish home once Elianne's final examinations were complete, she waited until the day after Elianne's examinations, June 26, to begin the search. Bruker also presents evidence that it may have been she, and not the CWA, who got OHEL involved. Defendants offer no admissible evidence that they attempted to contact other Jewish foster care agencies, or any evidence concerning the number of Jewish foster care agencies in New York,

the scarcity of Jewish homes, or the CWA's usual practices with respect to religious issues in foster placement.

In addition, the CWA opposed Bruker's order to show cause in the Family Court, and appealed the Family Court's decision ordering Elianne's transfer. The CWA was taking the position during this time that Elianne should not be moved because it was in her best interest to stay with Savoca. While the CWA may have had a good-faith basis for believing that this was the case, their opposition to her transfer calls into question the thoroughness of their efforts to find her a Jewish home. The fact that the CWA also attempted to excuse Savoca's failure to protect Elianne's religion further suggests that Bruker's religious preference was not being taken seriously.

Of course, plaintiff, not defendants, ultimately bears the burden of offering admissible evidence to raise a genuine issue of fact regarding the reasonableness of Perry's efforts. Bruker has satisfied the requirements of summary judgment on this point, based on the involvement of Perry, contrary to the explicit order of the Family Court, the fact that Bruker herself may have contacted the only Jewish agency which became involved in the case, and the CWA's opposition to any transfer for Elianne. Defendants have been unable to demonstrate any meaningful effort on Perry's part to accommodate Bruker's request for Elianne's transfer.

However, Bruker has failed to raise a genuine issue of fact as to the reasonableness of the municipal defendants' efforts after the Appellate Division's affirmance of the Family Court's order on December 22. After that point, the CWA's efforts to find a Jewish home for Elianne were complicated by the agency's need to persuade her to return to the system and by the documented difficulties they had in finding a Jewish

family which would accept a troubled adolescent who was not interested in participating in religious activities. Defendants have also presented evidence that their search for such a home became more thorough at this time, primarily through the participation of OHEL, and that Elianne was in fact placed in several Jewish homes for considerable periods of time. Moreover, defendants offer evidence, uncontested by Bruker, which indicates that both Bruker and Elianne rejected several proposed homes, and that Elianne ran away from Jewish homes several times. The search for a home was then interrupted by the decision by all parties to place Elianne in the hospital. When she left the hospital, it appears to have been the consensus that she should be placed in a group home or other therapeutic setting. The municipal defendants offer evidence that they sought several group homes for Elianne, including a Jewish one which Bruker rejected.

*Wilder* makes clear that the state's efforts to accommodate religious needs of parents and children are subordinate to the best interests of the child. It is not unreasonable that during this time period, the defendants involved in this case were concerned with issues other than Elianne's religion. Bruker concedes that during this time period, her own primary concern was ensuring that Elianne received adequate psychiatric care. Defendants have produced evidence that they continued to attempt to comply with the Appellate Division's order. Despite the deficiencies of Perry's prior efforts with respect to the religion issue, it cannot be said that a concern for Bruker's religion should have trumped Elianne's safety or psychological health during this time. For these reasons, Bruker has failed to raise an issue of fact as to the reasonableness of the CWA's efforts to find a Jewish home for Elianne after December 1992.

c. *The "Deal" Which Resulted in Elianne's Return to Foster Care*

Bruker contends that the CWA undercut the religious value of Elianne's placement in various Jewish homes by enabling her to visit the Catholic home in which she was originally, improperly placed. Bruker also contends that the CWA directed OHEL to pay a car service to take Elianne from her foster home to Susan Savoca's home whenever she wished. Bruker offers a letter from OHEL addressed to defendant Little, seeking reimbursement for the car service. The letter indicates that the service was authorized by Terry Walker of the CWA's Bronx Field Office, and that it was intended to take Elianne to the Bronx to attend school, as well as on weekends.

While Bruker has presented evidence raising an issue of fact as to whether the CWA agreed to permit Elianne to see Savoca, such action cannot constitute a violation of Bruker's First Amendment right. The CWA was at this time seeking to persuade a runaway child to re-enter the foster care system. To expect the CWA to disregard the safety of such a child in favor of protecting the parent's subordinate constitutional rights would turn *Wilder* upside-down. Moreover, Bruker does not raise a genuine issue of fact as to whether this "deal" caused her injury. As the facts of this case reveal, Elianne demonstrated that she was capable of running away and visiting Savoca whenever she wished. She did not require the CWA's assistance to do so.

Finally, plaintiff fails to raise a question as to whether the car service was instituted in order to take Elianne to see Savoca, rather than to take her to school. Accordingly, even if the CWA's actions could constitute a violation of plaintiff's rights, this evidence would not support the claim.

#### d. *Elianne's Placement in Boystown*

■ Bruker's first complaint concerning Boystown is that the agency violated the December 1992 Appellate Division order by accepting Elianne. But a "violation" of the Appellate Division order is not necessarily a constitutional violation. The Appellate Division based on state law its determination that Elianne's religion was not being protected. The First Amendment does not require, as the Appellate Division order did, that Elianne be transferred to an agency run by individuals of her faith; it requires only that the state make "reasonable efforts to assure that the religious needs of the children" placed in foster care are met during the period of that care. *Wilder*, 848 F.2d at 1347.

Bruker also contends that Boystown failed to provide Elianne with a Jewish environment. As described previously, Boystown has produced admissible evidence to show that it made efforts to preserve Elianne's Jewish upbringing, primarily through the efforts of Carolyn Novicoff. Bruker disparages Novicoff's religious credentials by labeling her "extremely reform," and notes that during Passover, Boystown served pork and bread. However, she does not assert that Elianne was served these foods. Bruker also offers the affidavit of Rabbi Michael Panitz, who states that a "child immersed in a Christian surrounding cannot learn a Jewish way of life." That may be so, but the state's duty is not to replicate the religious atmosphere of the home from which the child came, but only to make reasonable efforts to accommodate the child's religious practices within the constraints of the foster care system.

■ Bruker also argues that Boystown violated her free exercise right by permitting Elianne to visit Savoca. She offers what appear to be records from Boystown which illustrate that Elianne was in frequent contact with Savoca during her placement with Boystown and often stayed at Savoca's home for the weekend. Such activity does not give rise to a constitutional claim. To say that the state (or an organization acting on behalf of the state) must monitor all aspects of a foster child's behavior in order to insulate the child from any influence which may interfere with the child's religious practices places a burden of vigilance upon the state far greater than what *Wilder* or the First Amendment requires. Bruker has presented no evidence that Boystown permitted Elianne to visit Savoca in order to encourage her burgeoning interest in Catholicism, or that Boystown was even aware that Savoca was Catholic. Without evidence that Boystown was motivated by some proselytizing purpose, it cannot be held liable for permitting Elianne the same freedom to visit her friends that other foster children enjoyed.

The troubling issue with respect to Boystown is the fact that the agency enrolled Elianne in a Catholic high school. While placement of a child at a parochial school would not, in all cases, constitute a failure on the part of the state to accommodate the parent's and child's religious beliefs, Bishop Loughlin's handbook suggests that part of the school's mission is to inculcate Christian values. And it does appear that Elianne took at least one mandatory class with a Christian focus (her "Religion 10" class sophomore year). Boystown offers no explanation for why it chose a Catholic school rather than a public high school.

■ Boystown argues that the damage to Elianne's faith had been done before she arrived at Boystown. Elianne entered Boystown at age sixteen, two years after she had entered the state's custody. She had already become interested in Catholicism, had questioned Savoca about it, and had indicated that she wished to attend mass when she lived at Edwin Gould.

However, the fact that others had previously failed to protect Elianne's religion does not absolve Boystown of its duty to do so. Nor does it prove that placing Elianne in a Catholic high school for two years had no effect on her religious orientation. Whether such placement was reasonable, and whether significant Catholic influence occurred as a result of it, are questions of fact for the jury.

Bruker raises a genuine issue of fact as to Boystown's efforts to accommodate her religion. She also raises issues of fact respecting the municipal defendants' supervision of Elianne's placement at Boystown. However, Bruker has presented no evidence as to which CWA employees were responsible for Elianne's case at this point.

### 3. *Liability of the Municipal Defendants*

#### a. *The City and Its Agencies and Officials*

In order to succeed on her claims against the City and its agencies, as well as Little and Perry in their official capacities, Bruker must show that the violations of her constitutional rights occurred pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers ... [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (holding that a § 1983 claim brought against a state employee in his official capacity is a claim against the state). Bruker can fulfill this requirement in several different ways. By proof of an officially adopted rule or widespread, informal custom, Bruker can show "a deliberate government policy of failing to train or supervise its officers." *Anthony v. City of*

*New York*, 339 F.3d 129, 140 (2d Cir.2003). *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Bruker can also show that the allegedly unconstitutional action was "taken or caused by an official whose actions represent official policy." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000). However, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In addition to establishing that a policymaker ordered a subordinate's decision, a plaintiff can show municipal liability by demonstrating that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir.2004).

Finally, while a "single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy," *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993), the Second Circuit has noted, in the context of police brutality claims, that "a single, unusually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross negligence' on the part of officials in charge." *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.1980) (citing *Owens v. Haas*, 601 F.2d 1242 (2d Cir.1979)).

Bruker has offered no evidence that any of the actions of which she complains occurred under the auspices of an official policy. Indeed, the parties agree that the

CWA's established policy is to require all foster care agencies with which it contracts to meet the religious needs of the children referred to them. Similarly, Bruker has failed to proffer any evidence of an informal custom which was tolerated or tacitly endorsed by those in charge. And Bruker produces no evidence of the City's policies of training and supervision.

Bruker argues that Commissioner Little's participation in these events supports a determination that the City should be held liable for her injuries. She offers the following evidence of Little's involvement. She wrote numerous letters and placed many telephone calls to Little personally. Her New York State Assemblyman, Oliver Koppell, spoke to Little about the matter, and Little told Koppell that the CWA was looking into it. Little responded to Bruker's letters at least once. In a letter dated September 17, 1992, Little stated: "I have carefully reviewed the activities of my staff and find they have fully complied with departmental guidelines." He also stated that the CWA made repeated attempts to transfer Elianne to a Jewish foster care agency or a Jewish home. He noted that Elianne expressed a wish not to be moved, which was supported by her therapists, who stated that such a move would not be in her best interests. He also stated that the CWA had been advised that Elianne was attending Jewish services and that her foster family was enabling her to observe Jewish dietary laws. He concluded by urging Bruker to work with her lawyers to resolve the case. Finally, Bruker contends that Little personally instituted the car service to take Elianne to Savoca. This last assertion is not supported by any evidence.

▮ For several reasons, Bruker's evidence is insufficient to demonstrate that Little made a conscious choice to countenance violations of Bruker's free exercise rights. First, from his letter it is clear that Little became familiar with the facts of Elianne's case well after the initial placement decision had been made. He was not involved with the case from the beginning, such that he could be said to have directed or implicitly ratified Perry's behavior throughout.

Second, Perry's actions were not so obviously incorrect that Little should have been immediately aware that Bruker's rights were being violated. In 1992, as now, the state's obligations under *Wilder* were not entirely clear. Plaintiff has pointed to nothing in the CWA's files which should have made it plain to Little that Perry had thoroughly disregarded plaintiff's religious preferences. Unlike a case such as *Amnesty America*, where the chief of police was alleged to have directly observed his officers' excessive use of force on protestors, *see* 361 F.3d at 128, or *Owens*, in which the plaintiff claimed that he had been assaulted by a large group of correctional officers, *see* 601 F.2d at 1245, the state's failure to reasonably accommodate a foster child's religious practices was not readily apparent to an employee of the CWA who has had no direct involvement in the case.

▮ Finally, while it is disturbing that Perry was not reprimanded or removed as Elianne's caseworker after the Family Court determined she had submitted false information and should no longer have any direct contact with Elianne, "mere negligence or bureaucratic inaction" by an individual with policymaking authority is insufficient grounds to attribute liability to a municipality. *Amnesty America*, 361 F.3d at 128.

Bruker has offered no evidence to suggest that Little's inaction was a deliberate response to a known or suspected violation of her constitutional rights. At most, he was aware that Bruker wanted Elianne moved to a Jewish home and that she

believed her rights were being disregarded. To attribute liability to the City based on this minimal level of participation by the Commissioner of the CWA would evade the requirement that Bruker "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). While Bruker has raised a genuine issue of fact as to whether a single employee, Perry, violated her rights, "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Id.* at 403, 117 S.Ct. 1382.

Accordingly, summary judgment on Bruker's free exercise claim is granted to the City of New York, the City of New York Department of Social Services, the HRA, the CWA, and Little and Perry in their official capacities.

### b. *Commissioner Little*

■■■■ Bruker also sues defendant Little in his personal capacity. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Courts have articulated five types of activities which can suffice to support a showing of personal involvement: (1) the defendant directly participated in the alleged constitutional violation; (2) the defendant failed to remedy the violation after learning of it through a report or appeal; (3) the defendant created or continued to tolerate a policy or custom under which the violation occurred; (4) the defendant was "grossly negligent" in supervising subordinates who committed the violation; and (5) the defendant displayed "gross negligence" or "deliberate indifference" to the plaintiff's rights "by failing to act on information indicating that unconstitutional practices [were] taking place." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983)).

■■■■ For the same reasons that Bruker cannot impute liability to the City and its agencies based on Little's involvement in this case, she cannot show that Little was personally involved in violation of her rights. She has presented no evidence that Little's inaction amounted to deliberate indifference. Again, while it is troubling that Perry continued to work on this case despite the Family Court's determination that she had lied and should not have contact with Elianne and despite evidence that she had physically threatened plaintiff, plaintiff presents no evidence suggesting that Little was aware of these events. The letter from Little upon which plaintiff relies was written before the Family Court's determination that Perry had lied. Moreover, Little's failure to supervise Perry does not rise to the level of "gross negligence" sufficient to justify holding him personally liable for her actions.

Bruker also moves for a default judgment against Little, arguing that no appearance has been entered for him in his personal capacity. This appears to be incorrect. The notice of motion of the municipal defendants was made in behalf of all of the City's agencies and employees, including Little. Bruker appears to be primarily concerned that the municipal defendants were unable to give her an accurate address for Little's executor or widow. Because Bruker has failed to produce evidence raising an issue of fact as to Little's involvement in these events, it is not necessary to resolve that matter.

### c. *Dolores Perry*

■■■■ Perry argues that the doctrine of qualified immunity shields her from any liability in this case. Qualified immunity

protects government officials from suits for civil damages for performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ As noted in the previous opinion, the requirement that the state not totally ignore the expressed religious preferences of parents and children interacting with the foster care system was clearly established by 1992. *See Bruker,* 92 F.Supp.2d at 270. The fact that the precise nature of *Wilder's* "reasonable efforts" was not clearly established in 1992, *see id.,* does not permit a state employee to do absolutely nothing. Bruker has raised an issue of fact as to whether Perry did anything to fulfill the state's duties under *Wilder* when Elianne was initially placed and while she was living with Savoca. Accordingly, Perry has failed to show that qualified immunity should shield her from liability in this case.

### B. *Substantive Due Process*

Count Five alleges that defendants violated Bruker's substantive due process rights to family privacy and confidentiality by giving a copy of the neglect petition to the media and to Elianne's attorney, Pamela Liapakis. Bruker contends that this was a violation of the Constitution and of state law. Bruker is probably referring to N.Y. Family Court Act § 166, which provides that Family Court records shall not be open to "indiscriminate public inspection."

Even assuming that a private party has standing to sue for a violation of this state law, or that such a disclosure could rise to the level of a constitutional violation, Bruker has offered no evidence of when the petition was disclosed or who disclosed it. Bruker has failed to raise a genuine issue of fact in support of one of the essential elements of this claim. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

Moreover, Bruker has failed to offer any evidence which would support a finding that the municipality should be held responsible for the purported violation, or that Perry or Little were personally involved in the disclosure of the petition. Accordingly, she cannot hold any of these defendants liable under § 1983 for this alleged violation of her constitutional rights.

For these reasons, defendants' motion for summary judgment on Count Five is granted.

### C. *Procedural Due Process*

Bruker contends that Elianne was removed from her custody without a predeprivation hearing. Ordinarily, an analysis of this type of claim focuses on whether the state can demonstrate that at the time of the removal, it had an objectively reasonable basis for concluding that the child in question was in imminent danger. Only the presence of such emergency circumstances justifies removing a child without first obtaining parental consent or judicial approval. *See, e.g., Yuan v. Rivera,* 48 F.Supp.2d 335, 344–45 (S.D.N.Y.1999). However, Bruker's claim is complicated by several unusual circumstances.

Unlike most removals which occur prior to a hearing, the removal of Elianne was not the result of unilateral action by the CWA, but rather the result of an order by the Family Court judge in response to Elianne's refusal to return home. In other words the court, and not the defendants whom Bruker is suing, made the decision which may have deprived her of her liberty interest.

More directly, Bruker did not object to Elianne's removal on June 9 or to the fact

that she did not receive a pre-deprivation hearing. On June 9, Bruker's attorney responded to Elianne's stated desire not to return home by remarking that while she saw no reason why Elianne should not return home, she also understood that it was Elianne's choice. She then requested a post-deprivation hearing and a placement which would enable Elianne to see her therapist and to complete her final examinations. Judge Martinez's order for removal was therefore a response to the apparent consensus of all of the parties that Elianne should enter foster care for the time being. Bruker received a prompt post-deprivation hearing, which commenced two days after the removal and concluded eight days after the removal with a finding in her favor. Bruker cannot contend that she was deprived of a liberty interest when, through her attorney, she consented to the deprivation and received adequate post-deprivation review.

Finally, Bruker again faces the difficulty of assigning liability to these defendants. She has not shown that the removal occurred pursuant to a policy or custom, or that it was the result of inadequate training or supervision. Neither has she shown that Little or Perry were personally involved in the June 9 decision to remove Elianne.

Bruker also appears to argue that the Family Court's June 5 order, remanding the children to the CWA's custody, was itself a due process violation. But the record is clear that Allison was already in foster care at that time and that Elianne did not leave Bruker's custody until after the hearing on June 9. Bruker has failed to articulate what injury she could have suffered from the mere fact that the CWA obtained an *ex parte* order, when she had an opportunity to appear before the court four days later.

For these reasons, defendants' motion for summary judgment on Count Six is granted.

### D. *State Law Claims*

Bruker's negligence claims are not well-delineated. Insofar as she argues that any of the defendants is liable for negligent supervision, training, or hiring, she offers no evidence of what defendants' supervision, training, and hiring policies were. Without such evidence, she cannot raise an issue of fact regarding whether her injuries were caused by these problems, rather than the independent acts of various unnamed City employees. Accordingly, these claims are dismissed for lack of evidence necessary to support their essential elements. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

Bruker appears to base her claims of negligence and gross negligence on defendants' failure to provide Elianne with required therapy and failure to supervise Elianne while she was in foster care. But just as Bruker lacks standing to assert constitutional claims based on allegations of injury to her adult daughter, she cannot complain of defendants' alleged breach of duty to Elianne. Only Elianne may assert such claims.

To the extent that Bruker seeks recovery based on other negligent acts of defendants, she fails to articulate what those claims might be, or how the evidence she has presented establishes the essential elements of those claims.

■■■ Bruker's claims for intentional infliction of emotional distress also fails. To prove intentional infliction of emotional distress under New York law, a plaintiff must show that the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank,*

*N.A.,* 762 F.2d 212, 220 (2d Cir.1985) (quoting *Fischer v. Maloney,* 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978)). A plaintiff must also produce evidence which shows that the defendants' conduct was *"especially calculated to cause . . .* mental distress of a very serious kind." *Rooney v. Witco Corp.,* 722 F.Supp. 1040, 1045 (S.D.N.Y.1989) (quoting *Green v. Leibowitz,* 118 A.D.2d 756, 500 N.Y.S.2d 146 (2d Dep't 1986)). Bruker has failed to specify what conduct by any defendant rises to the level of truly outrageous conduct, or how any conduct on defendants' part was primarily motivated by a desire to cause her mental distress. "[W]hen the facts, viewed in the light most favorable to the moving party, fail to state a legal claim under applicable law, summary judgment dismissing the claim is appropriate." *Bryant v. Maffucci,* 923 F.2d 979, 984 (2d Cir.1991).

## II. *Bruker's Motions*

### A. *Motion for Summary Judgment*

Bruker moves for partial summary judgment. She argues that she has proved defendants' liability on all of the counts of the complaint and that the trial should be limited to the question of damages.

As outlined above, Bruker has raised an issue of fact with respect to whether Perry and Boystown violated her free exercise right. However, she has not shown that she is entitled to judgment as a matter of law on these claims or on her other claims. Accordingly, her motion for summary judgment is denied.

### B. *Motion for Reconsideration of Judge Pitman's Ruling on the Motion to Amend the Complaint*

Bruker's second amended complaint includes all of the claims which Judge Pitman denied Bruker leave to plead. Bruker argues that she may still seek to add these claims, because I never ruled on an order to show cause which she filed in August 2003, seeking review of several of Judge Pitman's rulings, including his denial of her motion to amend. That is not correct; at oral argument on September 11, 2003, I refused to overturn Judge Pitman's rulings.

At any rate, Bruker has not shown that Judge Pitman's refusal to permit her to add claims to the complaint was erroneous. Because the Family Court found Bruker guilty of neglecting Elianne, Bruker cannot show that the City's interference with her custody of her daughter was wrongful, which would be a required element of a claim of tortious interference with custody. As Judge Pitman noted, Bruker failed to plead her claims of fraudulent concealment and fraudulent misrepresentation with particularity. And as Judge Pitman correctly observed, there is no "tort of outrage" in New York law.

Bruker also sought leave from Judge Pitman to allege a claim of violation of her substantive due process rights, arising from a "deal" which the municipal defendants made with Elianne and also a grievance about a series of letters from Elianne's lawyer, Pamela Liapakis, threatening to sue the City if it settled the neglect case with Bruker. Judge Pitman's refusal to permit Bruker to add this claim was based in large part on the prior determination that Bruker could not state a substantive due process claim because she had consented to the continued remand of Elianne after the conclusion of the § 1028 hearing in Family Court. *See Bruker,* 92 F.Supp.2d at 266–67. Bruker argues that evidence shows that she did not voluntarily agree to Elianne's remand; rather, the CWA coerced her into leaving Elianne in the CWA's custody by threatening to keep Allison indefinitely. Essentially, Bruker is moving to reargue an issue originally decided in March 2000. This motion is untimely.

### C. *Motion to Amend to Reinstate Counts of the Amended Complaint*

Bruker also seeks leave to amend the second amended complaint to reinstate Counts Two and Three of the amended complaint, arguing that discovery has revealed a substantial evidentiary basis for these claims. Count Two alleged that the CWA, Little, the CHB, and Perry failed to properly supervise Savoca and failed to intervene when informed of Savoca's failure to care adequately for Elianne. This count was dismissed because Bruker had no standing to complain of injuries sustained by Elianne and had stated no claim of injury to herself. *See Bruker,* 92 F.Supp.2d at 266. Count Three alleged that the CWA, Little, Perry, the CHB, and Boystown failed to provide services to Bruker which would enable her to rebuild her relationship with her daughter. This count was dismissed on the ground of collateral estoppel and because Bruker had no constitutional right to rely on the state to reunite her family. *Id.* at 271. Therefore, her motion to amend is denied.

### D. *Request for an Order Curtailing Defendants' Presentation of Evidence at Trial*

In the alternative to her motion for summary judgment, Bruker asks that the municipal defendants be precluded from offering a factual defense against her claims, and asks for a finding that she has made "a prima facie showing of causation of fact." The basis for this request is defendants' purported failure to respond to certain of Bruker's discovery requests. Specifically, Bruker contends that defendants have failed to produce the Bronx Legal Correspondence Files, which she believes contain evidence of Elianne's attorney's threat to sue the City, which allegedly caused the City to renege on its agreement with Bruker for Elianne's voluntary placement.

Defendants respond that Bruker is seeking to reargue issues decided by Judge Pitman during discovery. At any rate, these documents relate to Bruker's substantive due process claim, which Judge Pitman correctly denied her leave to plead. Accordingly, plaintiff's request is denied.

### E. *Establishment Cause Violations*

Bruker makes several arguments in her opposition papers concerning defendants' alleged violations of the Establishment Clause. Opposition to a motion for summary judgment is not the appropriate time to raise claims for the first time. Moreover, Bruker has not offered evidence that raises issues of fact as to defendants' supposed Establishment Clause violations. Insofar as her arguments can be construed as a motion to amend the complaint to add such claims, that motion is denied.

### CONCLUSION

For the foregoing reasons, the municipal defendants' motion for summary judgment is granted in its entirety as to the City of New York, its agencies, and Commissioner Little. The motion is granted in part as to defendant Perry, and denied with respect to Bruker's free exercise claim against Perry arising from Perry's initial placement of Elianne in Savoca's home, Perry's supervision of the placement, and Perry's efforts, if any, to transfer Elianne to a Jewish home prior to December 22, 1992. Boystown's motion for summary judgment is denied with respect to Bruker's free exercise claim arising from Boystown's enrollment of Elianne in a Catholic high school, and granted with respect to plaintiff's other claims against Boystown.

SO ORDERED.